**INDEPENDENT SCHOOL DISTRICT NO. 192, Farmington, Minnesota, Relator,**

v.

**MINNESOTA DEPARTMENT OF EDUCATION, Respondent.**

No. A06–1905.

Court of Appeals of Minnesota.

Dec. 24, 2007.

Sara J. Ruff, Plymouth, MN, for relator school district.

Lori Swanson, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, MN, for respondent department.

Margaret O'Sullivan Kane, Kane Education Law, LLC, St. Paul, MN, for amicus curiae.

Considered and decided by HUDSON, Presiding Judge; WILLIS, Judge; and MINGE, Judge.

## OPINION

HUDSON, Judge.

This is a certiorari appeal from a decision by respondent the Minnesota Department of Education (MDE) concerning the provision of special-education and related services under the Individuals with Disabilities Education Improvement Act

(IDEA). Relator school district argues that (a) the MDE erred in awarding partial reimbursement for private academic tutoring when the findings showed that the student received appropriate academic instruction from his school; (b) the decision was based on a flawed investigation; and (c) the decision was arbitrary. Because the MDE's investigation was inadequate, and because partial reimbursement for the cost of private tutoring was inappropriate in this case, we reverse.

## FACTS

This appeal concerns a young boy (student) who attended school in Independent School District 192 (school district) in Farmington, Minnesota, from 2004 to 2006. When student was in kindergarten in 2004, the school district conducted an initial investigation and found student to be eligible for, and in need of, special-education services. Student's primary disability was in the area of emotional or behavioral disorders, characterized chiefly by his "remarkably aggressive, assaultive behavior." Accordingly, the school district developed an Individualized Education Plan (IEP) for student in January 2005.

The January 2005 IEP placed student at federal setting I.[1] The IEP listed five goals for student, including to improve his interaction with others; improve his hand and arm control; reduce the number of physical altercations with his peers; improve his ability to follow directions and participate in classroom activities; and improve his academic skills.

In September 2005, another IEP was filed because student had physical altercations with peers. The IEP included changes for "service minutes" and a plan for student "to make use of the resource room for verbal and physical altercations."

Although student's November 2005 progress report indicated that he made adequate progress toward his goals, from September 2005 through November 2005, student's special-education teacher sent several e-mails to student's father (father) advising him of student's academic difficulties and requesting that father work with student at home. Two e-mails from the teacher, dated September 21, 2005, and September 28, 2005, are representative. The September 21, 2005 e-mail stated: "I noticed that [student] has a very hard time with letter sounds and the high frequency words that the class is working on this week. They are included in his take home folder. He also had trouble with the math work. Anything you can do at home to help him would be appreciated." The September 28, 2005 e-mail stated: "Today [student] really struggled with words that have a short 'a' and short 'i' sound. If you could go over these words with [student] it would be helpful."

Following a similar e-mail on November 7, 2005, which discussed student's difficulties with counting money, father replied to the teacher: "I don't know if I told you but I hired a tutor for [student]." That same day, the teacher responded as follows: "Sounds like a good plan to have [student] get more help with academics. I'd be happy to fill [the tutor] in on the kinds of things I've been working on with [student] as he isn't doing all the regular first grade curriculum."

In December 2005, student was at a federal setting II.[2] Student's December

1. The federal setting refers to eight federal designations for levels that describe the setting in which a child is to be educated. Level I includes "[l]earners receiving the majority of their education program in regular class. Includes children and youth with disabilities, receiving special education and related services OUTSIDE THE REGULAR CLASSROOM for less than 21 percent of the school day."

2. Level II includes "[l]earners receiving education programs in resource room. Includes

2005 IEP listed three goals for student: (1) "to increase his ability to make positive choices in his behavior and words with peers and adults through all interactions he has during the school day"; (2) to "be able to follow directions, complete work, and otherwise attend to activities and discussions within the classroom in order to be more successful in the school environment"; and (3) to "increase his basic reading and math skills from a kindergarten level to a level that is more at the current grade level."

Student's January 2006 progress report showed that he continued to make adequate progress toward his goals, but it also indicated that from November 7, 2005, through January 20, 2006, student had ten physical altercations with other students and one physical altercation with an adult in which he threatened a teaching assistant with a pair of scissors. The report also stated that there were days "when he is physically appropriate throughout the entire school day."

In February 2006, school officials filed a document noting that student "has randomly pushed, poked, pulled, choked, grabbed, thrown ice, kicked, etc. other students which causes him to need to leave the classroom environment or other general areas and spend time in the special education resource room or school office." The document also noted that student "threatened a teaching assistant with scissors towards her neck." As a result of student's behavior, the IEP team decided to make some "significant changes" to student's program:

Beginning February 6, [student] will be changed to the Level III setting.[3] He will remain in the EBD classroom for the entire day. He will not attend specialists but will be given the opportunity to visit the library to check out books, will have opportunities to use the student computer in the classroom, and will have opportunities for art activities in the resource room. He will continue to receive OT services. He will continue with a separate recess time and will eat lunch in the cafeteria but will not be with his regular first grade peers. He will have a teaching assistant with him during the lunch period.

The portion of the document reserved for "Parent Action" indicated that father agreed with the decision to change student's IEP and that a team member had "[c]onversation with parents via telephone (1–19, 1–20) and also with [father] in person, 2–6–06" regarding the changes. But father maintained that he was not notified in advance that these changes would be made and that no one sought his approval.

In March 2006, father approached the principal of student's school to express his concerns that student had not yet been returned to the general-education first-grade classroom. An April 2006 progress report showed that student made "adequate progress" on his three goals, and student's April 2006 IEP showed a decrease in student's special-education-service minutes and a change from federal setting level III to level I.

Throughout his first-grade year, student was involved in more than 50 behavioral

children and youth with disabilities receiving special education and related services OUTSIDE THE REGULAR CLASSROOM for 60 percent or less of the school day and at least 21 percent of the school day."

3. Level III includes "[l]earners receiving education programs in separate class includes

children and youth with disabilities receiving special education and related services OUTSIDE THE REGULAR CLASSROOM for more than 60 percent of the school day. DOES NOT include pupils who received education programs in public or private separate day or residential facilities."

incidents and was disciplined many times. These incidents included numerous confrontations where student hit, choked, pushed, kicked, spat at, threatened, yelled at, and tripped other members of his first-grade class. He was suspended from school on March 17, 2006, for threatening to kill a student. Student was disciplined for his behavior in various ways, including being "curbed"; out-of-school suspensions; in-school suspensions; and recessing separate from the other students.

On May 15, 2006, father filed a complaint against the school district using the MDE's complaint process. The complaint alleged that (1) the school district changed student's federal setting placement without providing father with prior written notice; (2) the school district changed student's federal setting placement without including father in the group of people making the placement determination; (3) the school district violated standards related to IEP implementation; (4) the school district violated standards related to reporting progress on student's annual IEP goals; and (5) the school district failed to provide student with a free, appropriate public education (FAPE) during the 2005–06 school year.

The MDE initiated an investigation of father's allegations; both the school district and father submitted various documents including student's school records, copies of e-mail communications, and psychological reports. The MDE's investigator also logged several phone conversations over a period of almost three months, including conversations with father and voice-mail messages to certain school-district officials.

On August 11, 2006, the MDE filed a detailed report of its findings of fact, conclusions of law, and decisions on each of the five issues raised by father's complaint. The MDE sustained each allegation, finding multiple procedural and sub-stantive violations of the IDEA and state special-education laws. The MDE imposed corrective action for each violation. Most of the violations and corresponding corrective actions focused on: (1) the school district's failure to provide father with prior written notice of the modification to student's February 2006 IEP and the school district's related failure to include father in the IEP development process; (2) the school district's failure to develop an IEP for student that included positive behavioral interventions and its failure to properly report student's progress on his IEP goals; and (3) the MDE's determination that because student's IEP did not contain the needed positive behavioral supports, student was not making progress on his annual IEP goals related to improving his behaviors. Significantly, the MDE found that student's behaviors and concomitant frequent removals from class improperly segregated student from his peers and interfered with his academic progress, necessitating father hiring a private tutor. Based in part on this finding, the MDE concluded that student was denied a FAPE and imposed, among other things, the following corrective action:

> Within 21 calendar days of receiving this final decision, the District will obtain an invoice for the private tutor from [father] detailing the dates, times, and amounts of money paid to the private tutor by [father] during the 2005–06 school year and the summer of 2006. The District will reimburse [father] 50 percent of the total of the bill before the start of the 2006–07 school year.

The school district petitioned this court for a writ of certiorari. Father and student participate in this action as amici curiae under Minn. R. Civ.App. P. 129.01–.04.

## ISSUES

I. Did the Minnesota Department of Education's investigation satisfy the requirements of 34 C.F.R. § 300.661(a)(1), (3) (2005–2006)?

II. Did the Minnesota Department of Education err by imposing partial reimbursement of the cost of a private tutor?

## ANALYSIS

The school district challenges the MDE's August 2006 administrative decision. The school district does not challenge the majority of the MDE's findings or the bulk of the corrective actions imposed, but it argues that: (1) the MDE's investigation was fundamentally flawed; and (2) because it provided the requisite academic services to student, the MDE erred in mandating reimbursement for the private tutor.

■ When reviewing agency decisions, this court "adhere[s] to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001) (quotation omitted). "When an agency performs the quasi-judicial function of receiving and weighing evidence, making factual findings, and applying a prescribed standard to reach a conclusion, a reviewing court applies the substantial-evidence test." *Hurrle v. County of Sherburne*, 594 N.W.2d 246, 249 (Minn.App.1999) (quotation omitted). Substantial evidence is: "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 466 (Minn.2002). Under the substantial-evidence test, this court evaluates "the evidence relied upon by the agency in view of the entire record as submitted." *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship*, 356 N.W.2d 658, 668 (Minn.1984). This court will not reverse the decision of an administrative agency unless the decision "reflects an error of law, the determinations are arbitrary and capricious, or the findings are unsupported by the evidence." *Special Sch. Dist. No. 1 v. E.N.*, 620 N.W.2d 65, 68 (Minn.App. 2000) (quotation omitted). If an agency engages in reasoned decision-making, this court will affirm, even though it may have reached a conclusion different from the agency's. *Cable Commc'ns Bd.*, 356 N.W.2d at 669.

The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A) (2000 & Supp. V.2005). States "shall ensure that FAPE is available to all children with disabilities." 34 C.F.R. § 300.300(a)(1) (2005–2006).

■ If a dispute arises in which the parent of a child with disabilities objects to special-education programming matters, a parent may choose from two procedures in order to report and seek resolution of the complaint: (1) participating in an impartial due-process hearing, 20 U.S.C. § 1415(f) (2000 & Supp. V.2005); Minn.Stat. § 125A.091, subd. 12 (2004); or (2) filing a complaint with the state educational agency (SEA). *See Megan C. v. Indep. Sch. Dist. No. 625*, 57 F.Supp.2d 776, 780 (D.Minn.1999) (stating that there are "[t]wo separate, distinct, and independent

remedies" in disputes with school districts over the appropriate special-education services of children with disabilities: (1) due-process hearings; and (2) administrative-complaint procedures). In Minnesota, the SEA is the MDE. Here, father chose the administrative-complaint procedure and filed a complaint with the MDE on May 15, 2006.

In the administrative-complaint process, the MDE is required to: (1) determine whether an investigation is necessary, and if so, carry out an independent on-site investigation; (2) give the complainant an opportunity to submit additional information; (3) review all relevant information and determine whether the educational agency is violating the IDEA; and (4) issue a written decision that addresses each allegation in the complaint. 34 C.F.R. § 300.661(a)(1)-(4) (2005–2006).[4]

 We look to the statute "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). If a statute's language is unambiguous, we apply its plain meaning. *Id.; In re Risk Level Determination of C.M.*, 578 N.W.2d 391, 395 (Minn.App.1998). This court reviews issues of statutory construction de novo, "[b]ut where the statutory language is technical in nature, and the agency's interpretation is longstanding, that interpretation is entitled to some deference." *E.N.*, 620 N.W.2d at 68.

I

 The school district argues that the MDE's decision was arbitrary and capricious because its investigation was fundamentally flawed and was not conducted in accordance with 34 C.F.R. § 300.661(a)(1), (3). We agree.

The state complaint procedures under the IDEA are governed by 34 C.F.R. §§ 300.660–.662 (2005–2006). The regulations require an SEA to "[r]eview all relevant information and make an independent determination as to whether the [school district] is violating a requirement of [the act]" and to "[c]arry out an independent on-site investigation, if the SEA determines that an investigation is necessary." 34 C.F.R. § 300.661(a)(1), (3).

Here, the MDE submitted a 41–page decision that included a detailed explanation of its investigation, conclusions, the facts supporting each of its conclusions, and decision. The record shows that during the investigation, the MDE examined numerous documents relating to the case, including the relevant IEPs; progress reports; e-mail messages exchanged between the school district, father, tutor, and classroom teacher; student's report cards; student's attendance reports; student's diagnostic-assessment summary; the school district's student-discipline policy; reports from Behavioral Health Services; and student's psychological evaluations. The record also shows that the investigator made four telephone calls to the school district's special-education director and sent three e-mails. The telephone calls consisted only of voice-mail messages from the MDE investigator informing the special-education director about the timing and procedures of the investigation. The record further reflects, and the parties do not dispute, that the MDE did not undertake an on-site investigation and that the MDE investigator did not otherwise personally contact any school-district personnel. At no point did the MDE investigator make substantive inquiries or otherwise discuss

4. We note that on August 14, 2006, the U.S. Department of Education issued new IDEA regulations. *See* 71 Fed.Reg. 46540 (Aug. 14, 2006). The new regulations went into effect on October 13, 2006, and consequently do not apply to the present appeal.

father's allegations with school-district personnel.

Although the MDE maintains that the investigation only required review of the relevant paperwork, the MDE nevertheless conducted numerous interviews with father. The MDE also interviewed student's tutor, as well as father's special-education-rights advocates. But 34 C.F.R. § 300.661(a)(3) requires consideration of "all relevant information." In complex cases such as this one, such consideration should have included, at a minimum, interviews with relevant school-district personnel. This is especially true where key credibility determinations play a significant role in sustaining the complainant's principal allegations.

For example, the MDE found that student was denied a FAPE, in part because student's aggressive behaviors interfered with his academic progress, as noted in several e-mails sent to father in the fall of 2005. According to the MDE, father was thus forced to hire a private tutor. Although the MDE interviewed father and the tutor, the MDE never spoke with the special-education teacher who actually sent the e-mails, even though those e-mails were pivotal in the MDE's determination that student was not keeping up with the first-grade curriculum. Because of its truncated investigation, the MDE could only conclude that "[a]lthough the Student made progress on his academics during the 2005–06 school year, it cannot be ascertained whether this was due to the District's efforts or to the efforts of the Student's private tutor." As the school district aptly notes:

> Had the MDE investigator contacted the individuals who educated the Student at school, she would undoubtedly have been shown the materials they used to teach the Student, samples of the Student's work, the teacher's gradebook, and could have obtained helpful

information to allow the MDE to make some inferences as to whether the Student obtained benefit from the District's efforts or the Student's private tutor.

Although less significant to our decision, we also note that father alleged that student was transferred to the more restrictive Level III in February 2006 without his knowledge or consent. The MDE determined, based largely on father's statements, that the school district violated the IDEA by denying father an opportunity to participate in the February 2006 IEP meeting and failing to provide father with prior written notice before it changed student's placement. The school district acknowledges that it violated the IDEA by not including father in the actual IEP meetings and in not obtaining father's written consent to the transfer before implementing it. But father's knowledge of the February 2006 change to student's IEP was hotly disputed, with the school district maintaining that it discussed the change to student's IEP with father by telephone; father orally agreed to the change; and father received regular e-mails informing him of the time student spent in the resource room versus his regular first-grade classroom.

■ Although these efforts by the school district do not excuse its failure to comply with the IDEA's technical requirements for the development of an IEP, they are, in our view, relevant factors that warranted substantive investigation by the MDE before it determined the proper corrective actions. Accordingly, in this case, a review of "all relevant information" required not only a document review but interviews with both parties—not just the complainant and his witnesses. We hold that the MDE's failure to interview student's principal, special-education teacher, classroom teacher, paraprofessional, or any other school-district personnel directly

involved in the development of student's IEPs and overall education did not satisfy the regulatory mandate of 34 C.F.R. § 300.661(a)(3) to "review all relevant information." Moreover, confidence in the MDE's investigatory process and resulting decisions is severely undermined when the MDE engages in such one-sided fact-finding.

We also disagree with the MDE's assertion that 34 C.F.R. § 300.661(a)(1) did not require it to conduct an on-site investigation. The regulation requires an SEA to "[c]arry out an independent on-site investigation, if the SEA determines that an investigation is necessary." 34 C.F.R. § 300.661(a)(1). We find no ambiguity in this language, and we therefore apply its plain meaning. *C.M.*, 578 N.W.2d at 395. In so doing, we conclude that the plain language of the regulation requires an SEA to complete an on-site investigation when the SEA determines that an investigation is required. Here, the MDE clearly concluded that an investigation was necessary; accordingly, the MDE was required to conduct an on-site investigation. But the MDE investigator did not do so, as evidenced by the fact that the investigator did not visit student's school or the school district's special-education office.[5]

For all these reasons, we conclude that the MDE's decision was arbitrary and capricious because it was based upon a flawed investigation that failed to satisfy the requirements of 34 C.F.R. § 300.661(a)(1), (3).

## II

The school district also argues that the MDE erred as a matter of law by requiring partial reimbursement of the cost of a private tutor as a remedy for the school district's IDEA violations. We agree.

One purpose of the IDEA is to "ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs" to prepare them for the future. 20 U.S.C. § 1400(d)(1)(A). The IDEA defines a "FAPE" as

> special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8) (2000); *see* 20 U.S.C. § 1401(9) (Supp.V.2005) (defining FAPE).

Under the administrative-complaint procedure, if the MDE finds that the school district has failed to provide appropriate services, the MDE must address "[h]ow to remediate the denial of those services, including, as appropriate, the awarding of monetary reimbursement or other corrective action appropriate to the needs of the

---

**5.** In its brief and at oral argument, counsel for the MDE observed that in August 2006, the U.S. Department of Education issued an Analysis of Comments and Changes regarding the new regulations, and that these comments clarify that on-site investigations are discretionary with the local SEA. But the 2006 comments do not supplant the 2005–2006 C.F.R. that apply in this case because they were not promulgated at the time of this appeal. Under the 2005–2006 regulations applicable to this case, it is clear that if the SEA determines an investigation is necessary, it must conduct an on-site investigation.

child." 34 C.F.R. § 300.660(b)(1); *E.N.*, 620 N.W.2d at 71.

The MDE's basic position is that because the school district committed multiple procedural and substantive violations of the IDEA and, as a result, failed to provide student with a FAPE, the MDE has the authority to implement virtually any corrective action it deems appropriate. We disagree. Although the MDE's supervisory authority is broad, it is not limitless. And indeed, those limits are found in the same federal regulations that confer general supervisory authority to an SEA. Specifically, once the MDE finds "a failure to provide appropriate services," it must address how to "remediate the denial of *those services.*" 34 C.F.R. § 300.660(b)(1) (2005–2006) (emphasis added). Thus, the remedy must be calculated to remediate the services that the school district failed to provide.

■ We acknowledge—as we must— the MDE's unique role in supervising local school districts' compliance with federal and state special-education law and its broad oversight responsibility to ensure that local school districts provide free appropriate public educations to students with disabilities. This court recently recognized that authority in *Indep. Sch. Dist. No. 709 v. Bonney*, 705 N.W.2d 209 (Minn. App.2005).

Likewise, we acknowledge—as we must—the MDE's concomitant authority to remediate the denial of special-education services, "including, as appropriate, the awarding of monetary reimbursement or other corrective action appropriate to the needs of the child." 34 C.F.R. § 300.660(b)(1).

■ But we reject the MDE's conclusion that it has unlimited discretion to impose any corrective action whatsoever, regardless of its nexus to the actual IDEA infractions committed by the school district. Such boundless governmental authority is an anathema to basic notions of substantive due process. In this regard, the school district contends that it provided student with the requisite academic services, thereby providing student with a FAPE. Accordingly, the school district argues, monetary reimbursement for the tutor was not authorized under the IDEA. The MDE disputes this contention, noting that student was falling behind academically, primarily because he was frequently removed from his classes due to behavioral problems, and that the school district failed to include appropriate behavioral interventions in student's IEPs. The MDE contends that these violations collectively resulted in student not receiving a "free appropriate public education."

■ We agree with the MDE that the school district's *collective* violations denied student a FAPE. And in a case with similar facts, this court upheld monetary reimbursement for home-based educational services to a child even absent a finding that the school district failed to provide appropriate educational services, but when the school district violated other provisions of the IDEA. *E.N.*, 620 N.W.2d at 71. Thus, even if we were to agree with the school district that it provided the requisite academic services, the school district's other, *admitted* IDEA violations would still constitute a denial of a FAPE. That said, we nevertheless conclude that the MDE's reliance on *E.N.* to support its order for the monetary reimbursement of the tutor here is unavailing because in *E.N.* the monetary reimbursement was directly related to the academic service that was denied. Thus, when the school district ceased paying for E.N.'s home-based educational services in violation of his IEP, the commissioner ordered the school district to reimburse the parents of E.N. for expenses incurred in providing home-based educational services to E.N. *E.N.*, 620 N.W.2d at 68, 71. The

MDE's reliance on *Bonney* is similarly misplaced because in *Bonney,* the MDE's order for compensatory education was likewise directly related to the school district's failure to provide certain educational services. *Bonney,* 705 N.W.2d at 215. The common thread between *E.N.* and *Bonney* is the direct nexus between the corrective action imposed and the IDEA deficiency to be remedied. Here, that nexus is equivocal, at best.

Our position is primarily based on the fact that the overwhelming majority of the school district's IDEA violations related to the school district's failure to adequately address student's ongoing aggressive/assaultive behaviors in the his IEPs. Following a close second is the school district's failure to include father in the development of the February 2006 IEP and its related failure to provide father with prior written notice of student's transfer to the more restrictive Level III. Although unquestionably related, none of the violations listed above had a direct nexus to student's academic progress or lack thereof. This is evidenced by the fact that the principal corrective actions imposed by the MDE for those infractions fully addressed the denial of those services.

Thus, for example, corrective action # 1 required revisions to student's IEP to include, among other things, measurable goals and a positive behavioral-support plan. Corrective action # 2 required the school district to include father in the IEP development process. Corrective action # 3 required the school district to provide 25 hours of compensatory education services to student, but notably, this did not entail compensatory *academic* services; rather, the school district was directed to provide social/relational services "to make up for the opportunities the Student missed during the 2005–06 school year because of inadequate behavioral supports." The MDE specifically noted that this rem-

edy was "based on the amount of time he was placed in a federal setting three and missed recess, lunch, and other opportunities to be with his peers." Corrective action # 4 simply required the school district to correct its records to reflect that student was suspended from school for a day. Corrective actions # 5 and # 6 required the school district to implement training in IEP development and the use of positive behavioral interventions.

But the MDE's corrective action requiring the school district to reimburse father for the cost of hiring a private tutor has no direct nexus to the school district's principal violations of the IDEA—i.e., its failure to provide adequate behavioral supports, which, as noted above, was already addressed in corrective actions # 1, # 3, and # 6. Nor is the necessity for the tutor supported by the record.

The MDE points repeatedly to the school district's multiple procedural and substantive violations of the IDEA, and in particular the school district's unilateral decision to change the student's IEP in February 2006. But again, the MDE implemented separate corrective actions that directly addressed this violation. Moreover, father's November 2005 decision to hire a private tutor occurred well before the school district's unilateral February 2006 decision to transfer student to a different educational-programming level. Thus, father's decision to employ a private tutor for student was far removed from one of the school district's primary IEP violations, both temporally and substantively.

Furthermore, the record shows that student did progress academically during the year. In November 2005, student's psychiatrist noted that student was "doing reasonably well academically." Student's private tutor reported that student was performing at close to grade level by the

end of his first-grade year, and indeed, student achieved passing academic grades and was apparently promoted from first grade to second grade. When student was removed from his regular first-grade class, he was sent to the resource room where he continued to work on his academic studies with his special-education teacher. Even the MDE's decision recognizes that "the Student made progress on his academics during the 2005–06 school year." And while the MDE also concluded that "it is reasonable to assume the Student was educationally harmed," it is telling that the MDE did not order compensatory *academic* services despite its stated concern with student's academic shortcomings.

In support of its position that student was not progressing academically, the MDE points to the e-mails from student's special-education teacher indicating that student needed academic assistance and suggesting that father work with student at home. But as the school district notes, these were routine suggestions that might be made to any parent regarding parental review and reinforcement of certain academic skills at home. Nothing in those e-mails implied or suggested that student needed a private tutor. Parents commonly assist their children with their schoolwork, and that assistance should not be viewed as either indicating a deficiency in classroom teaching or imposing a liability on the school district. And although father was not legally required to do so, it is troubling that father did not notify the school district that he was in any way dissatisfied with the academic services student received or that he planned to hire a tutor.

We recognize the relationship here between student's behavioral issues and academic progress, but when, as in this case, the record plainly demonstrates and the MDE itself concluded that student made adequate academic progress, there is a fundamental disconnect between the MDE's finding of broader, procedural IDEA violations and the remedy of reimbursement for private tutoring expenses. When a school district violates an IEP, any corrective action must "remediate the denial of those services." 34 C.F.R. § 300.660(b)(1). Here, the school district's violations were primarily related to the school district's failure to provide appropriate behavioral services, not its denial of academic services. Monetary reimbursement for the tutor was not related to the denial of those behavioral services and, therefore, was inappropriate.

Finally, we note that the MDE's position would at least implicitly authorize any parent of a child receiving special-education services under the IDEA to be reimbursed for the cost of a private tutor, even though the parent: (1) never advised the school district that he/she was dissatisfied with the academic services offered, thus providing the school district the opportunity to address any deficiencies; (2) never notified the school district that he/she planned to hire a tutor; and (3) never requested reimbursement for the tutor's services. The policy and financial implications of such a ruling go far beyond what we believe the IDEA contemplates or authorizes. Accordingly, we conclude that partial reimbursement for the private tutor was an inappropriate remedy in this case. Because we reverse on other grounds, we do not address the school district's remaining arguments.

## DECISION

The corrective action imposed by the Minnesota Department of Education under 34 C.F.R. § 300.660(b)(1) (2005–2006)— partial reimbursement for the cost of a private tutor—was not sufficiently related to the school district's failure to provide

behavioral services and, therefore, was inappropriate.

**Reversed.**